IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KATHY KLEPPEL | § | |
| | § | |
| Plaintiff, | § | |
| V. | § | CIVIL ACTION NO. 4:16-CV-03715 |
| | § | |
| HUNTER'S MANUFACTURING | § | |
| COMPANY, INC. d/b/a TENPOINT | § | |
| CROSSBOW TECHNOLOGIES, | § | |
| | § | |
| Defendant. | § | |

## ORDER

This is a products liability and negligence case involving a crossbow. Pending before the Court is a Motion for Summary Judgment [Doc. No. 20] filed by Defendant Hunter's Manufacturing Company, Inc. d/b/a TenPoint Crossbow Technologies ("TenPoint"). The parties agree that Texas law governs this diversity suit. For the reasons set forth below, the Court hereby grants in part and denies in part TenPoint's Motion for Summary Judgment on Plaintiff Kathy Kleppel's strict liability claim based on an alleged design defect. The Court grants summary judgment on Kleppel's claims for negligence and gross negligence.

### I.    Material Facts

On July 12, 2015, Kleppel lost part of her thumb while using a TenPoint Titan TL-4 crossbow. A crossbow is a device that uses a bowstring to propel an arrow when the user pulls a trigger. The user pulls the bowstring back along a center rail until a latch attaches and holds the cocked bowstring in place. When the user pulls the trigger, the bowstring speeds forward along the center rail and propels an arrow.

Kleppel was holding the crossbow with the butt against her shoulder, her right hand on the grip or trigger area, and her left arm partly extended to support the forward part of the crossbow.

1

Her left thumb, however, was partially positioned above the center rail. As a result, when Kleppel pulled the trigger and the bowstring sped forward, the bowstring severed Kleppel's left thumb above the finger joint. Although Kleppel was rushed to a hospital in Uvalde, Texas, and airlifted to San Antonio, doctors were not able to reattach that part of her thumb.

On June 25, 2015—a couple of weeks before Kleppel's injury—Kleppel had contacted TenPoint to inquire about an accessory, an "ACUdraw," a device that assists the user in pulling the bowstring into a cocked position, and also about the difference between two crossbows that TenPoint had for sale. Kleppel testified that she believes she called TenPoint on the phone, although she is not certain.[1] Whether or not a phone call took place, Kleppel and a TenPoint representative also corresponded by email. Kleppel's message[2] read: "I have a Ten Point Titan TL-4, and my husband is now disabled and can't pull it back. Can we add some sort of ACU pull to this older model??? If so, what's the exact part number or name I'm looking for." A TenPoint customer service representative responded the same day via email:

> Good Morning,
> I copied a link from our website-
> http://www.tenpointcrossbows.com/shop/ACUdraw-Cocking-Mechanism-P23.aspx You are looking for the acudraw- it will work on older models. If you have additional questions or concerns call or email.
>
> Thank you,
> Amber Vandegrift.

One of TenPoint's exhibits includes a second exchange, also dated June 25, in which Kleppel's message read: "One more question: Is the Lady's Shadow and the Shadow Ultra-lite identical bows except for the color of the camo???" A TenPoint representative replied via email:

---

[1] Kleppel Dep. 93.

[2] The "From" field in the email to TenPoint shows that the email was sent from "TenPoint Info" rather than from Kleppel's email address. TenPoint's counsel suggested at Kleppel's deposition that the emails may be in this format because Kleppel filled out an online form on TenPoint's website that then sent an email to a TenPoint representative. *See* Kleppel Dep. 96.

Kathy,
Yes, they are the same bows just different colors.

Thank you,
Amber Vandegrift.

The TL-4 at issue was manufactured in 2006. The crossbow belonged to Kleppel's husband, Randy, who had purchased it second-hand from a previous owner in or around 2008. Kleppel never saw any instructions for the bow. As one of TenPoint's experts describes, the TL-4 "includes a foregrip that is ergonomically designed to keep the forehand away from the top rail of the assembly. The foregrip provides a natural hold spot for the hands which encourages the fingers and thumbs to remain away from the bowstring path during use. In addition, the design provides tactile feedback to the user so that the user may understand the location of their hand on the for[e]grip."[3]

Over time, TenPoint has made available two separate features on some of its crossbows: the GripGuard ("Guard") and GripSafety ("Safety"). The Kleppel TL-4 had neither the Guard nor the Safety. The Guard is a shield that fits over the crossbow's foregrip under the center rail. The "wings" extending out from the Guard keep the user's fingers below the center rail by putting a small ceiling between the foregrip and the center rail. Richard Bednar, who was involved with the design of the 2006 TL-4 and as of March 2018 was TenPoint's president and CEO, filed an application for a patent for a "Crossbow Grip Guard" in 2005.[4] The patent application depicts a device with wings extending out from the center rail. The application states:

> It is . . . known that during discharge of the cross bow and bowstring respectively certain associated operator[s] have placed a thumb or finger in the path of the moving bowstring, causing injury to the associated operator's appendage. What is needed is a device that maintains the appendages of the associated operator's hand

---

[3] Saunders Aff. 6 (italics omitted).
[4] The patent application also lists Michael Shaffer as an inventor. A 2006 patent application for a "Crossbow Grip Guard" filed by Bednar and Shaffer references the 2005 application and indicates that an "assignment of the invention" to TenPoint will follow.

that grasps the stock of the crossbow in a safe location during discharge of the crossbow and bowstring.

The patent application subsequently states: "The grip guard disclosed herein can be molded within the stock, or otherwise be an accessory, retro-fitted to existing crossbows in the marketplace." TenPoint, however, only began distributing the Guard in 2011. The Guard works on many previously manufactured TenPoint models, including the 2006 TL-4. The Guard costs $19, although TenPoint has at times offered it for free.

The Safety is a button on the crossbow's foregrip that the user must press and hold down when the user pulls the trigger. The crossbow will not fire unless the user is pressing the Safety at the time the user pulls the trigger. By requiring users to press and hold the button on the foregrip, the Safety encourages users to keep their thumbs or fingers on the foregrip and below the center rail. The Safety was available on certain TenPoint bows as early as 2003. It was not available on the 2006 TL-4.

Based on these facts, Kleppel has pleaded claims for strict products liability based on a design-defect theory, negligence, and gross negligence. Kleppel has adduced no expert testimony in support of any of these claims.

## II.    Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25.

The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

III.    **Strict Liability**

Kleppel seeks to hold TenPoint strictly liable for her injury under a design-defect theory. Her claim is that the 2006 TL-4 was defectively designed because it lacked a Guard or Safety. TenPoint takes the position that the TL-4 is safe for its intended use without a Guard or Safety. TenPoint also argues that Kleppel's lack of an expert witness renders her unable to survive summary judgment.

The Court finds that there is a genuine dispute as to a material fact on Kleppel's design-defect claim based on the lack of a Guard on the 2006 TL-4. The lack of a Safety, however, does not create a triable question of fact in the absence of expert testimony.

A.    **Applicable Law: Design Defects**

Under Texas law, the elements of a products liability claim based on an alleged design defect are: "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009); Tex. Civ. Prac. & Rem. Code § 82.005(a); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 788–89 (Tex. 1967) (adopting the Restatement (Second) of Torts § 402A (Am. Law Inst. 1965)).

The first element refers to an "unreasonably dangerous" product. "A product is unreasonably dangerous when its risk outweighs its utility." *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 6 (Tex. 2015). When weighing risk and utility, Texas courts consider five factors: "(1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer." *Id.* at 9–10; *Timpte Indus.*, 286 S.W.3d at 311. Whether a product is unreasonably dangerous in light of its risk and utility is generally a question of fact for the jury, but a court may decide it as a matter of law "if reasonable minds cannot differ on the risk-utility analysis considerations." *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 260–61 (Tex. 1999); *see also Genie Indus.*, 462 S.W.3d at 10 (stating that risk–utility "balancing is for the jury unless the evidence allows but one reasonable conclusion"); *Timpte Indus.*, 286 S.W.3d at 312 ("Although whether a product is defective is generally a question of fact, in the appropriate case, it may be determined as a matter of law.").

Under Texas law, "liability for a design defect may attach even if the defect is apparent." *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 383 (Tex. 1995). "The fact that a product user is or should be aware of the existence and avoidability of dangers inherent in a product's use that are obvious, commonly known, or warned against, is an important consideration in determining whether the product is unreasonably dangerous. In the risk-utility analysis, that fact may even be

6

decisive in a particular case. But in general, the obviousness of danger in and of itself is not an absolute bar . . . to liability for a defective design." *Hernandez*, 2 S.W.3d at 258; *see also Timpte Indus.*, 286 S.W.3d at 312.

The second element in a design-defect claim requires the existence of a "safer alternative design." "Safer alternative design" is statutorily defined as "a product design other than the one actually used that in reasonable probability: (1) would have prevented or significantly reduced the risk of the claimant's personal injury . . . without substantially impairing the product's utility; and (2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge." Tex. Civ. Prac. & Rem. Code § 82.005(b). "This design need not be actually built and tested; a plaintiff must show only that the alternative design was 'capable of being developed.'" *Genie Indus.*, 462 S.W.3d at 7 (quoting *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 592 (Tex. 1999)). The third element refers to a "producing cause." A "producing cause" is something that is a substantial and but-for cause of the event at issue. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007).

## B.     Applicable Law: Expert Testimony

"[E]xpert testimony is generally encouraged if not required to establish a products liability claim." *Id.* at 42. "Expert testimony is required when an issue involves matters beyond jurors' common understanding." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006). "In some cases, expert testimony may not be required. Whether expert testimony is required depends on whether the issue involves matters beyond 'the general experience and common understanding of laypersons.'" *Driskill v. Ford Motor Co.*, 269 S.W.3d 199, 204 (Tex. App.—Texarkana 2008, no pet.) (quoting *Tamez*, 206 S.W.3d at 583). "Proof other than expert testimony will support a jury

finding only when the jurors' common understanding and experience will allow them to make that finding with reasonable probability." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). "Whether expert testimony is necessary to prove a matter or theory is a question of law." *Tamez*, 206 S.W.3d at 583.

Expert testimony is often required to show that a safer alternative design existed. *Norman v. Grove Cranes U.S., L.L.C.*, No. 17-20631, 2018 WL 4339817, at *3–4 (5th Cir. Sept. 10, 2018) ("[N]umerous intermediate Texas courts and federal district courts have granted judgments in favor of defendants where no admissible expert testimony was offered to prove the existence of a safer alternative design."). In *Norman*, the plaintiff (Norman) sued after he was injured in an incident involving a crane. *Id.* at *1. The district court would not allow Norman's expert to opine on a safer alternative design for the crane, leaving Norman with no expert on the safer-alternative-design element. *Id.* at *2. "The district court solicited from Norman a controlling case where a lay person was permitted to testify as to a safer alternative design in a products liability case but Norman failed to produce one." *Id.* "Instead, Norman attempted to use his own testimony to show that a safer alternative design would be a previous model of a Grove crane" that did not have the alleged design defect. *Id.* The district court subsequently granted judgment as a matter of law to the defendant, and the Fifth Circuit affirmed. *Id.* The Fifth Circuit rejected Norman's argument that, as an "experienced rigger," he could testify as a lay witness regarding a safer alternative crane design of which he was personally aware because it was a previous model of a Grove crane. *Id.* at *4. After observing that "Norman failed to produce any controlling case law involving safe alternative design offered by a lay witness to successfully prove a products liability case," the Fifth Circuit held: "While the district court may have properly concluded that there is no controlling case law strictly prohibiting a lay witness from testifying as to safer alternative design, Norman

did not succeed in doing so here, given that the complex nature of crane design is very likely outside of the common experience of the jury." *Id.*

Patent applications may constitute some evidence of a safer alternative design under some circumstances. *See Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 331 (5th Cir. 2014) (stating, with respect to a patent application relating to vehicle-airbag material, that "[a] single patent or patent application may form the basis of an expert's conclusion that there exists a safer alternative design, but only if the patent or patent application, together with the expert's analysis of it, proves all of the elements of a safer alternative design"); *Merck & Co., Inc. v. Garza*, 277 S.W.3d 430, 440 (Tex. App.—San Antonio 2008), *rev'd on other grounds*, 347 S.W.3d 256 (Tex. 2011). In *Merck*, the plaintiffs brought a design-defect claim (as well as a marketing-defect claim) against Merck & Co., alleging that defects in Merck's prescription drug Vioxx caused the decedent's heart attack. 277 S.W.3d at 434. The court found insufficient evidence of a safer alternative design where the "only proof of a safer alternative design offered by plaintiffs was a patent application for a pain-relief drug designed by Merck that combines the gastro-protective qualities of Vioxx with the cardio-protective qualities of aspirin." *Id.* at 440. The court held that the patent application was "only slight circumstantial evidence" and that "something else must be found in the record to corroborate the probability" that the potential new drug covered by the patent application was a technologically and economically feasible alternative to Vioxx. *Id.*

Likewise, the Supreme Court of Texas has emphasized that expert testimony is often required in products liability cases to prove causation. *Gharda*, 464 S.W.3d at 348 (stating that "[w]e have consistently required expert testimony and objective proof to support a jury finding that a product defect caused the plaintiff's condition" and holding that expert testimony was required to prove the plaintiffs' theory on causation, namely that chemical contamination led to an

exothermic reaction that released certain gases that then caused an explosion and ensuing warehouse fire); *Tamez*, 206 S.W.3d at 582–83 (holding that an expert witness was required to prove causation where the plaintiffs alleged that defects in a truck's fuel system caused a post-rollover fire); *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) ("[W]e have consistently required competent expert testimony and objective proof that a defect caused the [vehicle's] acceleration"); *see also Smith v. Chrysler Grp., L.L.C.*, No. 17-40901, 2018 WL 6168079, at *5 (5th Cir. Nov. 26, 2018) (addressing the need for expert testimony to prove that an alleged defect caused a vehicle fire); *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 409 (5th Cir. 2016) ("Under Texas law, 'expert testimony is generally encouraged if not required to establish a products liability claim.' In particular, expert testimony is crucial in establishing that the alleged design defect caused the injury."). Nonetheless, "[l]ay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Kallassy v. Cirrus Design Corp.*, No. Civ.A. 3:04-CV-0727N, 2006 WL 1489248, at *5 (N.D. Tex. May 30, 2006) (quoting *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984)).

## C.     The 2006 TL-4 Crossbow

Kleppel alleges that the TL-4 that injured her was defectively designed because it lacked a Guard and/or Safety. Kleppel has offered no expert testimony of any kind.

### 1.     The Safety

Kleppel argues that the lack of a Safety on the TL-4 was a design defect, but her argument is ineffective because expert testimony is required and she provided none. In particular, expert testimony is required to show that a TL-4 with a Safety was an economically and technologically

feasible safer alternative design. TenPoint, for its part, has offered expert testimony that the Safety would not work on the TL-4.

Kleppel contends that the evidence shows that the Safety was an economically and technologically feasible safer alternative design because TenPoint had already included the Safety on certain crossbows as early as 2003, years before the 2006 TL-4 was manufactured. This contention has no evidence to support it. TenPoint's expert George M. Saunders stated in his affidavit that the Safety was not in fact compatible with the TL-4. Saunders, a mechanical engineer, stated: an "examination of the trigger components and function, combined with past experience, and a review of Patent 7,281,534, clearly indicated it would not be feasible to incorporate the GripSafety mechanism into the incident crossbow. . . . It was not feasible to incorporate the GripSafety mechanism into the incident crossbow due to incompatibility with the trigger assembly."[5] Saunders also stated: "The GripSafety was designed to be used only on a limited number of other model crossbows which had a different trigger mechanism . . . . Technical details of the trigger mechanism in this crossbow show that the trigger needs to be free to move in what would be the firing direction during the cocking sequence."[6]

Kleppel responds that TenPoint "has offered no summary judgment evidence why it was not feasible to use the PowerTouch trigger assembly that was compatible with the GripSafety safety device on the Titan TL-4 crossbow," particularly given that TenPoint evidently debuted certain new trigger styles around 2006. Her arguments are unavailing without expert testimony to support them. The mechanics of crossbow triggers and the interaction of the trigger mechanism with the Safety button are "matters beyond the general experience and common understanding of laypersons." Moreover, under *Celotex*, it is the plaintiff's burden to come forward and create an

---

[5] Saunders Aff. 8 (italics omitted).
[6] Saunders Aff. 8.

issue of material fact. *See* 477 U.S. at 322–23. Expert testimony is accordingly required to explain these mechanics and how they would have (if in fact they would have) allowed a Safety to be used on the 2006 TL-4. It is the plaintiff's burden to show that a safer alternative design was feasible. Tex. Civ. Prac. & Rem. Code § 82.005 (". . . the burden is on the claimant to prove by a preponderance of the evidence that . . . there was a safer alternative design . . . ."). It is not the defendant's burden to show that a certain potential alternative design was *not* feasible.

Even though the burden lies with the plaintiff, TenPoint has offered uncontroverted expert testimony that the Safety was not compatible with the 2006 TL-4. Accordingly, without expert testimony, Kleppel cannot use the existence of the Safety on other crossbow models to show that an economically and technologically feasible safer alternative design of the 2006 TL-4 existed. Kleppel consequently cannot use the Safety to create a fact issue on her TL-4 design-defect claim.

### 2.    The Guard

The 2006 TL-4 did not have a Guard—a relatively simple device when compared with the Safety. Kleppel alleges that a TL-4 with a Guard constitutes a safer alternative design and that the Guard-less[7] 2006 TL-4 was unreasonably dangerous. TenPoint disputes both the availability of a safer alternative design and the allegedly unreasonably dangerous nature of the Guard-less TL-4. The Court now confronts whether Kleppel has produced enough evidence, despite her lack of expert testimony, to create a triable fact issue regarding whether a TL-4 with a Guard was a safer alternative design and whether the Guard-less TL-4 was unreasonably dangerous. For the reasons stated below, the Court finds that Kleppel has met her evidentiary burden at the summary judgment stage.

---

[7] While the 2006 TL-4 had a foregrip with certain features meant to encourage safe hand placement, the Court will refer to the 2006 TL-4 as "Guard-less" to distinguish it from a crossbow with a Guard.

### a. Safer Alternative Design

TenPoint makes several arguments against the availability of a safer alternative design. First, TenPoint argues that the Guard constitutes a subsequent remedial measure and is therefore inadmissible. Second, TenPoint cites the fact that it did not distribute the Guard until 2011, meaning it was not available when the 2006 TL-4 was manufactured. Third, TenPoint contends that Kleppel has provided no evidence to show that adding the Guard to the 2006 TL-4 would have prevented or significantly reduced the risk of her injury and would not have created new hazards. Finally, TenPoint argues that Kleppel has not provided any expert testimony regarding whether the Guard could have been incorporated into the 2006 TL-4.

Although TenPoint cites the Texas Rules of Evidence for its subsequent-remedial-measure contention, it is the Federal Rules of Evidence that govern the admissibility of subsequent remedial measures in this diversity suit. *Grenada Steel Indus., Inc. v. Ala. Oxygen Co., Inc.*, 695 F.2d 883, 885 (5th Cir. 1983); *Sulak v. Am. Eurocopter Corp.*, 901 F. Supp. 2d 834, 839–40 (N.D. Tex. 2012). Under the federal rules, "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . a defect in a product or its design . . . ." Fed. R. Evid. 407. There are exceptions, however, providing that "the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving . . . the feasibility of precautionary measures." *Id.* TenPoint has disputed the feasibility of precautionary measures in 2006 (i.e., adding a Guard or similar winged foregrip to the TL-4).[8] Under the exception within Rule 407, then, the Guard that TenPoint ultimately began distributing in 2011, but designed in 2005, is admissible to prove the feasibility of precautionary measures in 2006, namely adding a Guard or similar winged foregrip to the TL-4.

---

[8] For instance, TenPoint contends that "neither the GripGuard nor the GripSafety were feasible features for the 2006 TL-4 model crossbow."

Kleppel must show that a safer alternative design existed in 2006. A "safer alternative design" is one that, "in reasonable probability," (1) "would have prevented or significantly reduced the risk of the claimant's personal injury," (2) "without substantially impairing the product's utility," and (3) "was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge." *See* Tex. Civ. Prac. & Rem. Code § 82.005(b).

The Court will take these prongs in reverse order, beginning with economic and technological feasibility. Kleppel's primary evidence that an economically and technologically feasible alternative design existed is the 2005 patent application for a "Crossbow Grip Guard."[9] TenPoint responds that it only began distributing the Guard in 2011, five years after the 2006 TL-4 was manufactured. It is unclear to what extent the Guard that TenPoint ultimately distributed is the same as the "Grip Guard" described in the patent application, but both share the fundamental feature of wings extending from the center bar that shield the user's fingers from the path of the bowstring.

This patent application—when viewed alongside the other evidence in the record and in context of the overall case—is probative of the contention that a safer alternative design was economically and technologically feasible in 2006. The patent application shows a blueprint of sorts that predates the manufacture of the 2006 TL-4, and the Court notes that there is no reason to believe that adding wings to the foregrip presented a technologically challenging endeavor. The basic simplicity of the design in the 2005 patent application distinguishes this case from *Merck*, where the patent application covered a potential new pharmaceutical. 277 S.W.3d at 440. The

---

[9] As stated previously, the inventors listed on the 2005 patent application were Richard Bednar and Michael Shaffer. Bednar was involved with the design of the 2006 TL-4 and as of March 2018 was TenPoint's president and CEO. The subsequent 2006 patent application filed by Bednar and Shaffer references the 2005 patent application and indicates that the invention will be assigned to TenPoint.

economic and technological feasibility of developing a new pharmaceutical is clearly a question of far greater complexity than the feasibility of attaching a different foregrip to a crossbow. While *Merck* found that the patent application was "only slight circumstantial evidence" of an economically and technologically feasible alternative to Vioxx, *id.*, the relatively simple patent application in Kleppel's case carries significantly more weight on the question of economic and technological feasibility.

The fact that TenPoint did not actually distribute the Guard until 2011 does not undercut the feasibility of a safer alternative design in 2006.[10] The alternative design "need not be actually built and tested; a plaintiff must show only that the alternative design was 'capable of being developed.'" *Genie Indus.*, 462 S.W.3d at 7 (quoting *Sanchez*, 997 S.W.2d at 592). That the alternative design was built in 2011 does not retroactively render the design unfeasible in 2006. If anything, the subsequent distribution of a Guard that works on the TL-4, as the Guard in fact does, tends to show that the Guard or a similar winged grip was a technologically practical alternative. There is evidence that this technologically practical alternative was also economically practical: the Guard that TenPoint eventually created costs $19, and TenPoint has distributed Guards free of charge.

The Court notes, in addition, that while Saunders, TenPoint's expert mechanical engineer, stated that the *Safety* was not compatible with the 2006 TL-4 and therefore could not have been implemented, Saunders did not address the feasibility of adding a *Guard* or similar device to the 2006 TL-4. Saunders merely opined that the 2006 TL-4 "was safe for its intended uses and did not

---

[10] Citing the 2005 patent application, Kleppel distinguishes between a Guard that is molded into the crossbow's stock and a "retrofit" Guard that can be attached to older crossbows lacking finger protection. According to Kleppel, TenPoint should have molded in a Guard to her 2006 crossbow so that she would not have needed the retrofit when it became available in 2011.

need a GripGuard."[11] In sum, the patent application, together with the basic simplicity of the winged-grip design and TenPoint's eventual production of a TL-4-compatible Guard, suggest that there is a fact issue regarding whether implementing the Guard or a similar winged grip was economically and technologically feasible in 2006.[12]

TenPoint does not argue that the Guard would have substantially impaired the product's utility.[13] That leaves the prong that adding a Guard to the TL-4 "in reasonable probability . . . would have prevented or significantly reduced the risk of the claimant's personal injury." Tex. Civ. Prac. & Rem. Code § 82.005(b). TenPoint argues that Kleppel has not provided a study, data, expert testimony, or any other evidence to show that the Guard would have prevented or significantly reduced the risk of her thumb injury. TenPoint also contends that Kleppel has not shown whether adding the Guard would create other, new risks.

While it is true that Kleppel has not presented a study, data, or expert testimony to show that a Guard would have prevented or significantly reduced the risk of her injury, Kleppel has

---

[11] Saunders Aff. 9 (italics omitted).

[12] Kleppel also claims that two of TenPoint's 2006 crossbow models (the Slider and Pro Slider) incorporated the Guard. TenPoint denies this claim, stating that the 2006 foregrip that Kleppel is referring to is not the Guard and that the Guard "is an entirely different design." Kleppel asserts that the 2006 TenPoint product catalog shows Guards on the Slider and Pro Slider, but the catalog refers to the grip merely as a "[s]afety-engineered fore-grip" rather than a "GripGuard." Additionally, TenPoint has produced a press release touting the debut of the Guard in January 2011. The only evidence Kleppel has that the foregrips on the 2006 Slider and Pro Slider models are Guards is a response to an interrogatory in which TenPoint indicates it has received reports of injuries involving, according to a chart, the Slider and Pro Slider "W/ BUILT-IN GRIPGUARD." This chart, though, is vague and unexplained, and it hardly proves that the Guard was actually available before 2011. The 2006 TenPoint Owner's Instruction Manual appears to depict protective wings extending from the "[s]afety-engineered fore-grip," yet given the insufficient evidence that this fore-grip is in fact the Guard, the Court will not speculate about the origin, features, or relevance of this other type of fore-grip that appeared on other crossbow models.

[13] Saunders's affidavit states that "[t]he movement of the limbs, cables, and string cannot be guarded without severely impacting the function/utility of the product." Saunders Aff. 6. The affidavit, however, does not explain this statement or how the crossbow's function or utility would be affected. It is also unclear whether Saunders is referring to a relatively simple guard like the Guard at issue in this case or some kind of more comprehensive guarding that somehow guards the user from the complete "movement of the limbs, cables, and string." Additionally, at one point in its briefing, TenPoint states that it made available "different designs of crossbows for its customers which allows the customer to select the crossbow based on the customer's criteria for its use, *i.e.*, weight, trigger, etc." If this statement is meant to suggest that adding the Guard would impair the crossbow's utility by making it heavier, then such a suggestion is nearly hidden in TenPoint's briefing and is not at all explained or argued.

produced evidence that the Guard is designed precisely to prevent or significantly reduce the risk

of her type of injury. The 2005 "Crossbow Grip Guard" patent application states:

> It is . . . known that during discharge of the cross bow and bowstring respectively certain associated operator[s] have placed a thumb or finger in the path of the moving bowstring, causing injury to the associated operator's appendage. What is needed is a device that maintains the appendages of the associated operator's hand that grasps the stock of the crossbow in a safe location during discharge of the crossbow and bowstring.

When TenPoint began distributing the Guard in 2011, its press release stated that "wings at the top

of the shield help prevent a shooter's fore-grip fingers or thumb from dangerously migrating above

the flight deck while shooting the crossbow." The press release also quoted Bednar saying that the

Guard "is an added safety feature we decided to make available to our customers." The patent

application and stated purpose of the Guard released in 2011, then, both identify the purpose of

the Guard as keeping the user's thumb and fingers safely out of the path of the bowstring. TenPoint

takes the position that the "Guard-less" crossbow already had a foregrip that, although lacking

wings, features an ergonomic design and tactile feedback meant to encourage safe hand posture.

TenPoint argues that Kleppel has produced no evidence that a crossbow with the Guard is safer

than a crossbow with the existing foregrip. The evidence just described, however, is sufficient to

create a fact question regarding whether a Guard or similar winged shield on the 2006 TL-4 would

have prevented or significantly reduced the risk of Kleppel's thumb injury. All Kleppel has shown

is that reasonable jurors could disagree about whether there was a safer alternative design;

TenPoint remains free to argue that a crossbow with the existing foregrip is just as safe as a

crossbow with a Guard at trial.

Furthermore, the fact that Kleppel did not produce an analysis of any new potential hazards

arising from implementation of the Guard does not mean that she has failed to produce facts

showing that a Guard would make the TL-4 safer and would have prevented or significantly

reduced the risk of her injury. Although TenPoint asserts that Kleppel has failed to produce such an analysis, TenPoint has not suggested an example of what any of these new hazards arising from the Guard might be. The fact that TenPoint later began distributing the Guard suggests that any new hazards, if they exist, are outweighed by the safety gains achieved with the Guard. Kleppel has accordingly met her burden to raise a fact issue as to whether a Guard would have made the TL-4 safer and would have prevented or significantly reduced the risk of her injury.

In the face of the factors mentioned above, TenPoint argues that Kleppel cannot make an adequate showing that a safer alternative design existed without expert testimony. Certainly, the caselaw addressing the need for expert testimony to show a safer alternative design is generally favorable for TenPoint's argument. With respect to the pleadings regarding the lack of a Safety, this Court obviously concurs. In *Norman*, for example, the Fifth Circuit observed that "numerous intermediate Texas courts and federal district courts have granted judgments in favor of defendants where no admissible expert testimony was offered to prove the existence of a safer alternative design." 2018 WL 4339817, at *3. Meanwhile, the plaintiff Norman had "failed to produce any controlling case law involving safe alternative design offered by a lay witness to successfully prove a products liability case." *Id.* at *4. Yet the Fifth Circuit's holding is also critical: "While the district court may have properly concluded that there is no controlling case law strictly prohibiting a lay witness from testifying as to safer alternative design, Norman did not succeed in doing so here, given that the complex nature of crane design is very likely outside of the common experience of the jury." *Id.* This holding notes that (1) lay testimony regarding a safer alternative design is not strictly prohibited and (2) the "complex nature of crane design" was a key fact for the court because such complexity "is very likely outside of the common experience of the jury."

Kleppel's claim concerning the Guard, by contrast, centers around an especially simple potential safer alternative design: a piece of plastic to keep the user's fingers safely shielded from the speeding bowstring above. This nearly unique degree of simplicity, involving a weapon that TenPoint repeatedly states is over 2,000 years old, distinguishes the instant case from much of the caselaw on the need for expert testimony in products liability cases. The high degree of simplicity in this case, for instance, makes the 2005 patent application more probative of the existence of a safer alternative design than the patent application in *Casey*, where the Fifth Circuit stated that "[a] single patent or patent application may form the basis of an expert's conclusion that there exists a safer alternative design, but only if the patent or patent application, together with the expert's analysis of it, proves all of the elements of a safer alternative design." 770 F.3d at 331. *Casey* involved a patent application titled Abrasion and/or Puncture Resistant Fabrics, Airbag Cushions, and Methods that called for the use of elastomer rather than nylon in side curtain automobile airbags. *Id.* The plaintiff in *Casey* sought to use the patent application and expert testimony relying on the patent application to show a safer alternative airbag design that would allegedly have prevented or significantly reduced the risk of personal injury during a vehicle accident. *Id.* at 331–32. Adding a Guard to a crossbow is manifestly distinguishable from changing airbag material or toying with the "complex nature of crane design."

Despite Kleppel's failure to produce expert testimony, the Court finds that the evidence discussed above is sufficient to create a triable question of fact regarding whether a safer alternative design for the TL-4 existed in 2006. "Whether expert testimony is necessary to prove a matter or theory is a question of law." *Tamez*, 206 S.W.3d at 583. While this Court is troubled over the lack of expert testimony supporting Kleppel's claim, it cannot say as a matter of law given

the facts that exist that Kleppel has not established a factual issue as to the existence of a safer alternative design.

### b. Unreasonably Dangerous

Having survived summary judgment on the safer-alternative-design element of her design-defect case, Kleppel must next show that the 2006 TL-4 was "unreasonably dangerous" as designed. Under Texas law, the Court assesses whether the risks of the product outweigh its utility, relying on five factors to make the assessment. *Genie Indus.*, 462 S.W.3d at 9–10. Here, the "product" is the Guard-less TL-4. The risk–utility "balancing is for the jury unless the evidence allows but one reasonable conclusion." *Id.* at 10. It is clear to the Court that this is not a case where "the evidence allows but one reasonable conclusion," and the Court accordingly finds that weighing the risks and utility of the Guard-less TL-4 and determining whether the Guard-less TL-4 is unreasonably dangerous are within the province of the jury.

Reasonable individuals could form myriad opinions about the five factors and their relative weights, and the Court will not now attempt an exhaustive analysis of the factors. The Court, rather, will examine the factors individually and in their totality to ascertain whether, when taking Kleppel's evidence as true and drawing all reasonable inferences in her favor, a question of fact exists concerning whether the TL-4 was unreasonably dangerous as designed. The first factor is "the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use." The TL-4 is a device that can be used for hunting or recreation, but TenPoint has not stated what the specific utility, if any, of a *Guard-less* crossbow is. The numerous specific warnings of the risk of severe injury to the user's fingers should they rise above the center rail, contained in the TL-4's Owner's Instruction Manual and in a "hang tag" attached to the crossbow that users remove before use, tend to suggest that the gravity and likelihood of

injury are both somewhat serious.[14] The second factor, "the availability of a substitute product"—here a crossbow with a Guard—"which would meet the same need and not be unsafe or unreasonably expensive," has already been discussed above in connection with the safer-alternative-design element. The same is true of the third factor: "the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs." The Court will consider the fourth factor more fully below. The fifth factor, "the expectations of the ordinary consumer," is somewhat unclear, and the Court need not speculate about what an ordinary consumer might expect when using a crossbow.

The fourth factor, "the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions," raises both the issue of the obviousness of the danger and the issue of "suitable warnings." On the issue of obviousness, TenPoint contends that the danger posed to anyone who places her fingers in front of the speeding bowstring is open and obvious. TenPoint cites the portion of Kleppel's deposition testimony where she acknowledged that placing any body part in front of the speeding bowstring would result in injury.[15] More generally, TenPoint insists that the 2006 TL-4 was and is safe for its intended purposes given the inherent way a crossbow works. Both of TenPoint's experts, Saunders and Lorne Smith, Jr. (a hunting and crossbow instructor as well as an accident reconstructionist),

---

[14] Kleppel repeatedly cites as evidence the fact that TenPoint has received over 130 reports of finger injuries from its crossbows (2 of which involved the TL-4). TenPoint objects to this evidence of "other claims" on relevance grounds, arguing there is no evidence showing that the claims are reasonably similar to Kleppel's claim. The Court has not found it necessary to consider the "other claims" evidence for purposes of this summary judgment ruling. The "other claims" evidence has not been considered for purposes of this order, and TenPoint's objection is therefore moot at this stage.

[15] Kleppel Dep. 69–70.

opined that the fast-moving bowstring is an inherent part of how a crossbow works, that crossbows have been safely used for over 2,000 years, and that the 2006 TL-4 was safe for its intended use.[16]

Kleppel correctly responds that open and obvious dangers are still potentially actionable under Texas law. *See Shears*, 911 S.W.2d at 383; *Hernandez*, 2 S.W.3d at 258 ("The fact that a product user is or should be aware of the existence and avoidability of dangers inherent in a product's use that are obvious, commonly known, or warned against, is an important consideration in determining whether the product is unreasonably dangerous. In the risk-utility analysis, that fact may even be decisive in a particular case. But in general, the obviousness of danger in and of itself is not an absolute bar . . . to liability for a defective design."). The Supreme Court of Texas has reaffirmed:

> The focus of a design defect claim … is whether there was a reasonable alternative design that, at a reasonable cost, would have reduced a foreseeable risk of harm. Thus, if it is reasonable for a product's designer to incorporate a design that eliminates an open and obvious risk, the product reaches a more optimum level of safety by incorporating the safer design than by keeping the current design with the open and obvious risk.

*Timpte Indus.*, 286 S.W.3d at 314 (internal citation omitted). There is conflicting evidence regarding whether the allegedly open and obvious danger in this case was in fact obvious to Kleppel. Although she testified that the fast-moving bowstring would injure any body part in its way, she also testified: "If I would have known that bow in any way, shape, or form could cut anyone's body parts, digits off, it would have been trashed."[17] She added: "If I had known that that could potentially cause harm, especially to my fingers that I rely on my income [sic], I never would have used it."[18] The jury at trial will be free to attach heavy weight to the allegedly open and

---

[16] Saunders Aff. 6; Smith Aff. 2–3.
[17] Kleppel Dep. 179–80.
[18] Kleppel Dep. 180.

obvious (and ancient) nature of the hazard in this case if it so chooses, but the Court will not rule that this alleged obviousness renders the TL-4 not unreasonably dangerous as a matter of law.

The other issue raised by the fourth factor is the mitigation of danger due to suitable warnings or instructions. Warnings are once again one factor, among others, for the jury to consider. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex. 1998) ("[W]e agree with the new Restatement that warnings and safer alternative designs are factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe."). In *Uniroyal Goodrich*, the Supreme Court quoted with approval a Restatement comment:

> . . . In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks. For example, instructions and warnings may be ineffective because users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings. However, when an alternative design to avoid risks cannot reasonably be implemented, adequate instructions and warnings will normally be sufficient to render the product reasonably safe. . . . *Warnings are not, however, a substitute for the provision of a reasonably safe design.*

*Id.* at 336 (quoting Restatement (Third) of Torts: Prods. Liab. § 2 cmt. *l* (Am. Law Inst. 1998) (emphasis added by the Supreme Court)). When assessing the fourth element, then, the Court will follow the Supreme Court's instruction to consider warnings as one factor, among others, for the factfinder to weigh in the risk–utility balancing process. In this case, TenPoint included repeated warnings in the Owner's Instruction Manual and on the hang tag regarding the danger posed to a user's fingers should they enter the bowstring's path. On the other hand, Kleppel testified that she never saw any instructions for the TL-4,[19] a bow her husband had acquired second-hand from a previous owner.

---

[19] Kleppel Dep. 50.

Viewing the summary judgment record and the factors in their totality, the Court finds that the question as to whether the 2006 TL-4 was unreasonably dangerous presents a genuine dispute as to a material fact that must be resolved by the jury. The first, second, third, and fifth factors are hardly conclusive on the outcome of the risk–utility balancing process, and although the fourth factor implicates certain evidence favorable to TenPoint with respect to the alleged obviousness of the danger from the bowstring and the provision of warnings with the product, this evidence is not sufficient to allow the Court to rule that the crossbow is not unreasonably dangerous as a matter of law. As with the safer-alternative-design element, Kleppel has shown the existence of a fact issue on the unreasonably-dangerous element.

### c.  Producing Cause

To satisfy the third and final element of her design-defect claim, Kleppel must show that there is a fact question around whether the alleged defect was a "producing cause" of her injury. She has done so: There is at a minimum a fact question around whether the lack of a Guard was a producing cause—i.e., a substantial and but-for cause—of her thumb injury. As discussed above, the Guard was designed to protect users from the precise injury that Kleppel suffered, and a reasonable jury could find that but for the absence of a Guard, Kleppel's thumb would not have been severed.

The only real hurdle that Kleppel faces to survive summary judgment on the producing-cause element is the extensive Texas caselaw indicating that expert testimony is often required to show causation. Once again, though, the basic simplicity of Kleppel's injury means that expert testimony is not required in this case. The cases where Texas and federal courts applying Texas law have required expert testimony to show causation have involved allegations of far greater complexity. *See, e.g.*, *Gharda*, 464 S.W.3d at 348 (that chemical contamination led to an

exothermic reaction that released certain gases that then caused an explosion and ensuing warehouse fire); *Tamez*, 206 S.W.3d at 582–83 (that defects in a truck's fuel system caused a post-rollover fire); *Armstrong*, 145 S.W.3d at 137 (that a defect caused a vehicle's unintended acceleration); *Smith*, 2018 WL 6168079, at *5 ("that a defect in the Jeep's transmission oil cooler caused a leak that caused transmission fluid to come in contact with an ignition source that caused the fire"); *Sims*, 839 F.3d at 397, 409 (that a defect in a car's fuel tank caused it to rupture during a crash, leading to a fire); *Kallassy*, 2006 WL 1489248, at *1, *5 (that chronic excessive vibration in an aircraft caused neurological injury to the plaintiff's hands and feet). The causation theory in this case, by contrast, is one that jurors can judge based on their common understanding and experience without the aid of expert testimony.

Kleppel has produced sufficient evidence for each element of her design-defect claim to create a triable question of fact. The Court consequently denies TenPoint's motion for summary judgment on the design-defect claim.

## IV.     Negligence and Gross Negligence

Kleppel focuses her negligence argument on TenPoint's alleged failure to provide her with a Guard when she contacted TenPoint about unrelated matters a couple of weeks before her injury. Taking Kleppel's evidence as true, the evidence at most shows that she informed a TenPoint representative that she (or her husband) had a TL-4 while seeking information about an ACUdraw device. The evidence also shows that Kleppel briefly inquired about the difference between two different crossbows that TenPoint was then selling. Her theory is that TenPoint negligently failed to provide her with a Guard, a product TenPoint was distributing for free, upon learning that she had a TL-4. For its part, TenPoint argues, among other things, that it had no post-sale duty to Kleppel and that Kleppel has produced no evidence to prove the elements of negligence.

Kleppel also pleaded negligence based on a variety of other allegedly negligent conduct by TenPoint, including failing to design and manufacture the TL-4 so as to be reasonably safe to users, failing to implement a safer design when the safer design could have been reasonably implemented, failing to adopt a safer design when any warnings left a significant residuum of risks to users, and failing to issue a recall.

The Court need not address the parties' arguments about the presence or absence of a post-sale duty in this case because the Court finds that, even assuming *arguendo* that TenPoint owed Kleppel a duty, Kleppel has produced no evidence that TenPoint breached any duty to her. *See, e.g.*, *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002) ("A cause of action for negligence in Texas requires three elements. There must be a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach."). Kleppel has produced no expert testimony to show what a reasonably prudent crossbow manufacturer or seller would have done under the same or similar circumstances. *See Hager v. Romines*, 913 S.W.2d 733, 734–36 (Tex. App.—Fort Worth 1995, no writ) (rendering a take-nothing judgment where the plaintiffs failed to offer expert testimony showing how a reasonably prudent aerial herbicide applicator would have acted under the same or similar circumstances). There is no evidence in the record setting out the appropriate standard of care or demonstrating that TenPoint or any of its employees failed to conform to the appropriate standard of care. Under *Celotex*, Kleppel has the burden to produce sufficient evidence to support the essential elements of her case. *See* 477 U.S. at 322–23. Kleppel has not done so here, and summary judgment in favor of TenPoint is consequently warranted on Kleppel's negligence claims.

Since Kleppel cannot establish a negligence claim, she cannot establish a gross negligence claim. "A defendant 'cannot be grossly negligent without being negligent.'" *Driskill*, 269 S.W.3d

at 206 (quoting *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex. App.—Austin 1990, writ denied)). Summary judgment in favor of TenPoint is warranted on Kleppel's gross negligence claim as well.

## V.    Conclusion

For the reasons explained above, the Court denies TenPoint's motion for summary judgment on Kleppel's strict products liability claim with regard to the Guard allegations but grants the motion as to the Safety allegations. Further, the Court grants TenPoint's motion for summary judgment on all of Kleppel's negligence and gross negligence claims.[20]

Signed at Houston, Texas, on this _7_ day of December, 2018.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

---

[20] The Court denies TenPoint's request for oral argument [Doc. No. 20]. The arguments and evidence contained in the parties' filings have adequately framed the dispute.